UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jennifer Martin,

    Plaintiff,

v.                                                  Case No. 16-11930

Tall Brown Dog, LLC, *et al.,*        Sean F. Cox
                                                                United States District Court Judge

    Defendants.
_____/

**OPINION & ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANTS' MOTION TO STRIKE JURY DEMAND**

Plaintiff filed this action against her former employer and two of its managers, asserting pregnancy discrimination claims under Title VII and Michigan's Elliott Larsen Civil Rights Act ("ELCRA"). The matter is currently before the Court on "Defendants' Motion for Summary Judgment And, Alternatively, to Strike Jury Demand." The parties have fully briefed the issues and the Court heard oral argument on June 15, 2017. For the reasons set forth below, the Court shall: 1) DENY Defendants' Motion for Summary Judgment; and 2) GRANT Defendant's unopposed request to strike Plaintiff's jury demand.

**BACKGROUND**

Plaintiff Jennifer Martin ("Martin") filed this action on May 27, 2016, and filed an Amended Complaint on June 1, 2016. Her Amended Complaint asserts claims against three defendants: 1) Tall Brown Dog, LLC ("Tall Brown Dog" or "the Company"), Martin's previous employer; 2) Brian Paavola ("Paavola"); and 3) Mark Silverstein ("Silverstein"). Her Amended Complaint asserts the following claims:

1

- "Count I – Violation of Title VII" wherein Martin alleges that Defendants discriminated against her based on her sex and the fact that she was pregnant and improperly terminated her from her position as a Business Development Lead, in violation of Title VII.

- "Count II – Violation of the Elliott-Larsen Civil Rights Act" wherein Martin alleges that Defendants discriminated against her based on her sex and the fact that she was pregnant, and terminated her from her position as a Business Development Lead, in violation of Section 202 of the ELCRA.

Martin's Amended Complaint includes a jury demand. (D.E. No. 3 at Pg ID 14).

Following the close of discovery, Defendants filed a "Motion for Summary Judgment And, Alternatively, To Strike Jury." (D.E. No. 21).

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 14 at 2-3).

In compliance with this Court's guidelines, in support of their Motion for Summary Judgment, Defendants filed a "Statement of Material Facts Not In Dispute" (D.E. No. 21 at Pg

ID 77-79). ("Defs.' Stmt."). In response to that submission, Martin filed a "Counter-Statement of Disputed Facts" (D.E. No. 25 at Pg ID 320-23) ("Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Martin, the non-moving party*.

Tall Brown Dog sells temporary labor to a variety of companies. Martin was employed by the Company from late May of 2015 until October 5, 2015. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 1). Paavola is the CEO of the Company.

Martin reported to Silverstein, the Vice President of Sales and Marketing. (Martin Dep. at 44).

Martin testified that in addition to sales, her position was also considered a "leadership position" and that part of her role was going to involve tasks that other sales persons did not have:

> A. Both Cormac and Mark [Silverstein] discussed with me a lot about my social selling that I was talking about when I was hired and wanted me to develop that and teach my peers that . So it was sort of an experiment, if you will, does this work, can we apply it, how will we apply it type process for myself. They said, "We're going to call you a salesperson –" or actually, they let me call myself business development because I didn't want to be called sales, but from there they wanted me to basically delve into social selling and selling online.
> Q. How did they communicate that want to you?
> A. Verbally.
> Q. Was this before you were hired or after?
> A. Both.

(Martin Dep. at 46). Silverstein also testified that "business development" was part of Martin's title. (Silverstein Dep. at 25 & 27). It is undisputed that Martin was paid a higher salary than other employees who held the title of sales associate.

After she was hired, Martin was given a "scorecard" that laid out the Company's

expectations for sales associates. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 1). Martin testified that because she was going to be in a leadership position as well as sales, the Company told her that the scorecard would only loosely apply to her:

> Q. Did you talk about this scorecard at all in the context of your employment at Tall Brown Dog?
> A. The way this was given to me is, and you can sort of tell by our wages how they differed, my wage to the other salespersons' wages, that I would be in a leadership position. They said, "This is what we give our salespeople." And they said, "We're going to be changing these things and this a loose – for you, it's very loose as far as what we want for you.
> . . . .
> Q. Did they ever tell you that you weren't going to be held to these key outcome standards?
> A. Yes.

(Martin Dep. at 45-46).

Shortly after beginning her employment with the Company, Martin became pregnant. On June 20, 2015, She informed Silverstein of her pregnancy in an email that read:

> I have news. I'm pregnant - due 2/2016. I found out Wednesday and saw the baby doctor today. She cautioned me on foods and medications and then added warnings about heat. I mentioned that I would be outside for a few hours on Tuesday and she let me know there's no way for me to know my inner core temp in the heat while active. She said 101 degrees causes miscarriage and can happen due to dehydration. She was concerned also because I'd mentioned I am a golf novice. . . . I asked her if I carried a water and didn't fully swing if it would be okay but I think she wanted to err on the side of caution . . . I want to let you know that I'm very capable in my current state . . . I am used to working while carrying. I'm happy to be here. I'm already seeing that I've helped a few members of our sales team in certain ways . . . I look forward to what is ahead!

(D.E. No. 25-3). Silverstein responded:

> Congratulations! Please plan on still coming to the meeting, there is no need to take a risk with golfing but will you ask your doctor about just driving the golf cart and keeping in the shade?
>
> I certainly agree that you have helped with the sales team and would not expect anything less during your pregnancy and after you have the baby.

4

> We can talk on Monday.
>
> Have a great weekend.

(D.E. No. 25-3 at Pg ID 354).

Martin suffered a miscarriage a few days later. Martin advised Silverstein that she was in the hospital and had miscarried via a text message on June 22, 2015. Silverstein responded, "I'm so sorry. Get some rest" and "See you next week. Good luck with training." (D.E. No. 25-4).

Martin's physician released her to return to work on June 26, 2015. (D.E. No. 35-6).

The first month or so of Martin's employment consisted of her receiving training and, therefore, she did not actively start doing any sales work until July 1, 2015. (Silverstein Dep. at 35).

On September 1, 2015, Martin advised Silverstein and Branch Manager Shannon Collins that she was pregnant again, via an email. (D.E. No. 25-5). In that email, Martin advised that she was pregnant again, that she was not feeling well, and that she needed to stay home and take a sick day. Silverstein responded:

> OK well I was hoping to take at least a few minutes today or tomorrow to sit down with you and come up with a plan that will encourage and allow you to reach your required sales activities based on your scorecard. As we discussed in our email last night, 69 total activities is not nearly enough for you to get through your territory to weed out the companies that use or don't use a staffing service. Do you think you'll be in tomorrow morning?

(D.E. No. 21-17 at Pg ID 226).

On Friday, October 2, 2015, Paavola was in the Southgate office and spoke with Martin, who advised him that she was pregnant again. (Martin's Dep. at 111; Paavola Afft. at ¶ 6). Martin testified as follows as to her encounter with Paavola that day:

> Q. Did anything happen on October 2nd other than Brian was in the office?

> A. No. I just told Brian that I was pregnant and I needed to know how we were going to plan for the delivery because I knew I wasn't eligible for FMLA, there was no policy that the company had to do anything for me, so I was just concerned about planning ahead.
> Q. Did he say anything in response to –
> A. He said, "Well, people have been pregnant here before."
> Q. Okay. It doesn't sound necessarily negative.
> A. No, he just kind of looked at me and got very stoic, you know, and walked away.

(Martin Dep. at 112).

On Monday, October 5, 2015, Silverstein called Martin into his office, saying "we need to talk." (Martin Dep. at 115).

Martin testified that she and Silverstein did not discuss her sales activities, or lack of sales, during that meeting, nor did they discuss her performance at all. (*Id*. at 115-16). Rather, Silverstein simply told her "this is not going to work out," and then Silverstein led Martin to her desk and directed her to clean it out. (*Id*. at 116-17). Martin testified that Silverstein then asked her for her keys[1] to the office and escorted her out of the office. (*Id*. at 117-18). Martin Testified that Silverstein did not say the actual words "you are fired" or "you are terminated." (*Id.* at 117-118).

Silverstein has a very different version of events. Silverstein testified that the purpose of that meeting was not to terminate Martin's employment, that he had no intention of terminating Martin's employment at that time, and he had not been advised or directed by anyone to terminate Martin's employment at that time. (Silverstein Dep. at 45-46).

Silverstein testified that the purpose of his October 5th meeting with Martin was to

---

[1] Silverstein admits that he asked Martin for her keys on October 5th. (Silverstein Afft. at ¶ 9).

discuss her performance and to "try to develop her, to have her follow her score card, make sure she was doing what she needs to do. That was the – it was just another verbal meeting that we had to discuss her lack of activities." (Silverstein Dep. at 45). Silverman further testified:

> Q. Was it – I assume it was your belief that if Ms. Martin did that, then she could continue to be an employee?
> A. Yes.
> Q. So despite your concerns about her performance, it was not your opinion that termination was something that was warranted at that time, is that correct?
> A. Yes, that is correct.

(Silverman Dep. at 46).

Silverman contends, contrary to Martin's testimony, that during his meeting with Martin, she abruptly left the meeting, gathered her belongings and left, leading him to conclude that Martin had quit. (Silverstein Afft. at ¶ 9).

Shortly after the October 5th meeting with Silverman had ended, Martin sent an email to Paavola, at 3:24 p.m., stating:

> Hi Brian,
>
> I want to let you know I'm very heavy hearted to have been let go today. I'm sure you would've known during your visit that today would be my last. I'm not sure why the information in TempWorks wasn't valuable along with the agreements I had hanging in the balance. I believed I had a lot to contribute to your sales team that would have served their mission. I had sent Cormac information on the sales method for consulting with prospects and even he had liked it. I'm devastated and wondering if this is something to do with my mentioning leave plans for my pregnancy. This came out of the blue. I would have thought there would've been more serious talk about needed improvement first.

(D.E. No. 25-7).

In an email sent to Paavola, and three other people at the Company (Bret Roberson,

Cormac Fox,[2] and Ronald Green), on October 5, 2015 at 4:23 p.m., Silverstein stated: "I let Jennifer go today" (D.E. No. 25-8).

Paavola forwarded Martin's October 5th email to Cormac Fox and Silverstein at 11:40 p.m. on October 5th, stating "Why was this not discussed with me? Please let me know we gave her fair warning in writing." (D.E. No. 21-18).

In an email sent to Paavola on October 6, 2015 at 9:20 a.m., copied to Silverstein and Roberson, Cormac Fox stated:

> We discussed this briefly. Not the actually letting Jennifer go, but whether or not she was told what her expectations are and that she was not meeting these expectations. She understood what her expectations where [sic] and Mark during conversations and emails let her know throughout her time that she was not meeting these expectations. He did not actually write her up, but she knew she was not meeting her numbers.
>
> Yesterday when Mark talked to her about the fact that her selling method is not working she packed her bags and left the office. Mark did not stop her and asked for her key. He never said to her that she was being let go. He never said that she was terminated.

(D.E. No. 21-18).

During her employment with the Company, Martin was only engaged in sales for approximately three months. (Silverstein Dep. at 35).

Defendants have not produced any "write-ups" or disciplinary notices that were given to Martin during her employment. Silverstein testified that he is not aware of any such notices in Martin's personnel file. (Silverstein Dep. at 24-25).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact.

---

[2]Defendants' brief states that Roberson and Fox were Business Development and Operations Managers at the Company at this time. (Defs.' Br. at 2).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## ANALYSIS

In this action, Martin asserts pregnancy discrimination claims under both Title VII and the ELCRA. The ELCRA claims are analyzed in the same way as the claims brought under Title VII. *Kubik v. Central Mich. Univ. Bd. of Trustees*, __ F.Supp.3d __, 2016 WL 6947415 at * 13 (6th Cir. 2016).

It is well established that Title VII's prohibition on employment practices that discriminate "because of" an individual's sex apply to employers who discriminate on the basis of pregnancy. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657 (6th Cir. 2000). A claim of discrimination on the basis of pregnancy is analyzed in the same manner as any other sex discrimination claim brought under Title VII. *Id*. at 658.

The "familiar *McDonnell Douglas* burden-shifting framework" is used to analyze these claims. *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006). First, the plaintiff must present a prima facie case. *Id.* If she is able to do so, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is

9

able to do so, then the burden shifts back the employee, who must ultimately show that the employer's articulated reason for the action was a pretext for intentional discrimination. *Id.*

I.      **Martin Has Presented A Prima Facie Case Of Pregnancy Discrimination.**

In order to show a prima facie case of pregnancy discrimination, a plaintiff must show that: 1) she was pregnant; 2) she was qualified for the job; 3) she was subjected to an adverse employment action; and 4) there is a nexus between her pregnancy and the adverse employment action. *Cline*, 206 F.3d at 658; *Asmo*, 471 F.3d at 592.

Here, there is no real dispute about the first and second elements. It is undisputed that Martin was pregnant at the time of the events in question and thus the first element is met. At oral argument, Defense counsel acknowledged that Martin was objectively qualified for the position by virtue of her prior experience in the industry and that Defendants cannot challenge that element based on their allegations of poor performance. *See Kulik v. Medical Imaging Resources, Inc.*, 325 F. A'ppx 413, 414 (6th Cir. 2009).

    A.      **Martin Has Created An Issue Of Fact As To Whether She Was Terminated.**

In their motion and reply brief, Defendants assert that Martin was not terminated by Silverstein and that she simply walked out and quit after their discussion on October 5, 2015. Defendants therefore argue in their motion that Martin's claim fails because "she was not terminated." (Defs.' Br. at 1).

Construing the evidence in the light most favorable to Martin, she has produced sufficient evidence (Martin's testimony, along with Silverstein's October 5, 2015 email stating, "I let Jennifer go today") to create a genuine issue of fact as to whether Silverstein terminated her employment on October 5, 2015.

## B. There Is Sufficient Evidence Of A Nexus Between Martin's Pregnancy And Her Termination.

A plaintiff establishes the fourth element of a prima facie case of pregnancy discrimination by showing a nexus (i.e., a connection or link) between her pregnancy and her termination. To show such a nexus, the employee must present sufficient evidence from which a reasonable jury could infer that there was a nexus between the plaintiff's pregnancy and her termination. *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 442 (6th Cir. 2002). Such a causal nexus may be established in several ways. One way to show such a causal nexus is to show a close temporal proximity between an employer learning of the employee's pregnancy and that employee's termination.

The Sixth Circuit has held that, at the prima facie stage, there are circumstances where evidence of "temporal proximity alone" is sufficient to establish a causal nexus. That is the case when the adverse employment action occurs very close in time after learning of the protected activity. *See Montell v. Diversified Clinical Svs., Inc.*, 757 F.3d 497, 505-06 (6th Cir. 2014); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Herrera v. Churchill McGee,* LLC, 545 F. App'x 499, 501-02 (6th Cir. 2013). For example, in *Asmo*, a temporal proximity of two months between the time that the employer learned of the plaintiff's pregnancy and her termination was sufficient. *Asmo*, 471 F.3d at 594.

Here, construing the evidence in the light most favorable to Martin: 1) Sliverstein learned of Martin's second pregnancy via Martin's September 1, 2015 email; and 2) Paavola learned of Martin's pregnancy on Friday, October 2, 2015. On Monday, October 5, 2015, Silverstein called Martin into his office, saying "we need to talk." Silverstein then told Martin "this is not going to work out," led Martin to her desk , directed her to clean it out, asked her for her keys to the

11

office, and then escorted her out of the office.

Thus, the alleged termination occurred *one month* after Silverstein learned of Martin's second pregnancy, and *the next business day* after Martin told Paavola that she was pregnant and wished to discuss a pregnancy leave. The Court concludes that this is one of those circumstances where temporal proximity alone is sufficient to meet the fourth element of a prima facie case.

### III. There Is Sufficient Evidence Of Pretext To Survive Summary Judgment.

Defendants argue that Martin was not terminated by Silverstein. They argue that "even if she had been, such termination" would have been warranted as "performance-based" because Martin's "performance was not acceptable." (Def.'s Br. at 1 & 11).

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

As the Sixth Circuit has explained, "[p]retext is a commonsense inquiry: did the

employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

At the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's nondiscriminatory reason for the challenged action is a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

In *Asmo*, the plaintiff alleged that she was terminated because she was pregnant. In discussing pretext, the Sixth Circuit found the "most significant evidence showing pretext" was the conduct of the plaintiff's supervisor, Santoro, when she announced she was pregnant during a team conference call. *Asmo*, 471 F.3d at 594. During that conference call, the plaintiff announced that she was pregnant with twins. The Sixth Circuit explained:

> The news was met with congratulations from all her colleagues except Santoro, who did not comment and then "simply moved on to the next business topic in the conference call." (J.A. 158-59). Santoro's initial silence is suspect. Pregnancies are usually met with congratulatory words, even in professional settings. When people work together they develop relationships beyond the realm of employment, and [the plaintiff's] pregnancy was particularly noteworthy given that she was pregnant with twins, a fairly unusual (and overwhelming) occurrence.

*Id.* The Sixth Circuit further explained that the employer's "argument that there are other possible explanations for Santoro's silence is correct and well taken. However, in the context of summary judgment, where we examine the evidence in the light most favorable to the non-moving party, we believe that Asmo's argument is sufficient to call into question Santoro's motives." *Id.* at 595.

Similar evidence exists in the record submitted by the parties in this case. Construing the

13

evidence in the light most favorable to Martin, Sliverstein learned of Martin's second pregnancy via Martin's September 1, 2015 email that informed him she was pregnant again (after having miscarried a few months ago), was not feeling well, and needed stay home to take a sick day. Silverstein responded:

> OK well I was hoping to take at least a few minutes today or tomorrow to sit down with you and come up with a plan that will encourage and allow you to reach your required sales activities based on your scorecard. As we discussed in our email last night, 69 total activities is not nearly enough for you to get through your territory to weed out the companies that use or don't use a staffing service. Do you think you'll be in tomorrow morning?

(D.E. No. 21-17).

On Friday, October 2, 2015, Paavola was in the Southgate office and spoke with Martin, who advised him that she was pregnant again. Martin testified as follows as to her encounter with Paavola:

> Q. Did anything happen on October 2nd other than Brian was in the office?
> A. No. I just told Brian that I was pregnant and I needed to know how we were going to plan for the delivery because I knew I wasn't eligible for FMLA, there was no policy that the company had to do anything for me, so I was just concerned about planning ahead.
> Q. Did he say anything in response to –
> A. He said, "Well, people have been pregnant here before."
> Q. Okay. It doesn't sound necessarily negative.
> A. No, he just kind of looked at me and got very stoic, you know, and walked away.

(Martin Dep. at 112).

Silverstein's reaction to Martin's telling him that she was pregnant again (not congratulating her or acknowledging it in his response, and then moving on to discuss performance issues) could be viewed as suspect. This is especially so given that Silverstein was aware that Martin had suffered a miscarriage just a few months earlier. In addition, Paavola's

14

reaction when Martin advised him that she was pregnant again and was concerned about her pregnancy leave could also be viewed as suspect. *Asmo*, 471 F.3d at 594; *Majer v. Lexion Med.*, LLC, 2010 WL 6755636 at * 12-13 (N.D. Ohio 2010) (employer's response to news of pregnancy considered as evidence of pretext). As was the case in *Asmo,* there are certainly other possible explanations for the reactions of Silverstein and Paavola. But, viewing the evidence submitted in the light most favorable to Martin, as this Court must do when reviewing this motion for summary judgment, this could show pretext.

Plaintiff has also submitted other evidence of pretext, via Silverman's testimony. In their motion, Defendants assert that Martin's performance as of October 5, 2015 warranted termination. Yet, during his deposition in this case, Silverman – Martin's direct supervisor – testified:

> Q. So despite your concerns about her performance, it was not your opinion that termination was something that was warranted at that time, is that correct?
> A. Yes, that is correct.

(Silverman Dep. at 46). Silverstein's testimony, construed in the light most favorable to Martin, could show that Defendants' proffered reason (Martin's allegedly unacceptable performance) was insufficient to warrant the challenged conduct (Martin's alleged termination on October 5, 2015).

The Court concludes that Martin has submitted sufficient evidence from which a reasonable jury could conclude that Defendants' stated reason for the challenged action is unworthy of credence and is a pretext for unlawful pregnancy discrimination.

The Court shall deny Defendants' Motion for Summary Judgment and allow Martin's claims to proceed to trial.

### III. The Court Shall Grant Defendants' Unopposed Request To Strike The Jury Demand.

In the pending motion, Defendants also ask the Court to strike Martin's jury demand because Martin waived her right to jury trial by virtue of documents she executed when she began her employment with the Company. (Defs.' Br. at 14).

In response, Martin does not dispute that she signed the documents at issue or validly waived her right to a jury trial. (*See* D.E. No. 25 at Pg ID 329-30). Martin does not oppose Defendants' request that the Court strike her jury demand.

Accordingly, the Court shall grant Defendants unopposed request and strike Martin's jury demand. Thus, unless the parties otherwise agree, the action will proceed to a bench trial before this Court.

### CONCLUSION & ORDER

For the reasons set forth above, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' unopposed request to strike Plaintiff's jury demand is **GRANTED** and Plaintiff's jury demand is hereby **STRICKEN.**

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: June 23, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 23, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager